UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LASHONDA S., | ) |
| Plaintiff, | ) No. 22-cv-5071 |
| v. | ) Magistrate Judge Keri Holleb Hotaling |
| KILILO KIJAKAZI, Acting Commissioner of the Social Security Administration, | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Lashonda S.[1] appeals the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her disability benefits. The parties have filed cross motions for summary judgment.[2] As detailed below, Defendant's motion for summary judgment [Dkt. 20] is GRANTED; Plaintiff's motion for summary judgment [Dkt. 17] is DENIED. The final decision of the Commissioner denying benefits is affirmed.

**1.     Background**

    **1.1.   Procedural History**

On January 23, 2019, Plaintiff filed separate applications for Title II Disability Insurance Benefits and for Title XIV Supplemental Security Income, alleging a disability onset date of February 11, 2017. [Administrative Record ("R.") 134.] Plaintiff's claims were denied initially and upon reconsideration. [*Id.*] At the Administrative Hearing, Plaintiff amended her alleged disability onset date to January 1, 2020. [R. 135.] Following the Administrative Hearing, on December 28, 2021, Administrative Law Judge ("ALJ") Luke Woltering issued an unfavorable decision in Plaintiff's case.

---

[1] In accordance with Northern District of Illinois Internal Operating Procedure 22, the Court refers to Plaintiff only by her first name and the first initial of her last name(s).

[2] The Court construes "Plaintiff's Brief in Support of Reversing the Decision of the Commissioner of Social Security" [dkt. 17] as a motion for summary judgment.

[R. 134-150.] On September 16, 2022, Plaintiff filed suit to challenge this decision. [Dkt. 1.] The ALJ's December 28, 2021 decision is now before the Court.

### 1.2. The ALJ's Decision

At Step One of the ALJ's December 28, 2021 decision, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset date of January 1, 2020. [R. 137.] At Step Two, the ALJ found that Plaintiff had the severe impairments of: degenerative disc disease of the cervical spine; degenerative disc disease of the lumbar spine; bilateral L5-S1 pars defect; schizoaffective disorder; major depressive disorder; and generalized anxiety disorder. [*Id.*] The ALJ determined that Plaintiff had the nonsevere impairment of headaches (which Plaintiff described as migraines), and explained why they were nonsevere. [*Id.*]

At Step Three, the ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments of 20 C.F.R. Part 404, Subpart P, App'x 1. [R. 137-40.] Before Step Four, the ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work with the following limitations: cannot climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl; cannot work around hazards such as unprotected heights and exposed moving mechanical parts; cannot tolerate more than occasional, concentrated exposure to fumes, noxious odors, dusts, mists, gases, and poor ventilation; can understand, remember, and carry out short, simple work instructions and can sustain concentration to perform simple, routine, and repetitive tasks; needs to work in a low pressure and low stress work environment defined as one requiring only simple, work-related decision making, occasional changes in the work setting, no work at a production rate pace, such as assembly line work or other work requiring rigid quotas; can have only occasional interaction with coworkers and supervisors performing job duties that do not involve tandem tasks or teamwork, and only incidental contact with the public. [R. 140.] At Steps Four and Five, the ALJ

found Plaintiff unable to perform any past relevant work, but that other jobs existed in significant numbers in the national economy Plaintiff could perform. [R. 149-50.] Because of these determinations, the ALJ found Plaintiff not disabled under the Act. [R. 150.]

**2. Social Security Regulations and Standard of Review**

The Social Security Act requires all applicants to prove they are disabled as of their date last insured to be eligible for disability insurance benefits. ALJs are required to follow a sequential five-step test to assess whether a claimant is legally disabled. The ALJ must determine: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; and (3) whether the severe impairment meets or equals one considered conclusively disabling such that the claimant is impeded from performing basic work-related activities. 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920(a)(4)(i)-(v). If the impairment(s) does meet or equal this standard, the inquiry is over, and the claimant is disabled. 20 C.F.R. § 416.920(a)(4). If not, the evaluation continues and the ALJ must determine (4) whether the claimant is capable of performing his past relevant work. *Cannon v. Harris*, 651 F.2d 513, 517 (7th Cir. 1981). If not, the ALJ must (5) consider the claimant's age, education, and prior work experience and evaluate whether she is able to engage in another type of work existing in a significant number of jobs in the national economy. *Id.* At the fourth and fifth steps of the inquiry, the ALJ is required to evaluate the claimant's residual functional capacity ("RFC") in calculating which work-related activities she is capable of performing given his limitations. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004). In the final step, the burden shifts to the Commissioner to show there are significant jobs available that the claimant is able to perform. *Smith v. Schweiker*, 735 F.2d 267, 270 (7th Cir. 1984).

In disability insurance benefits cases, a court's scope of review is limited to deciding whether the final decision of the Commissioner of Social Security is based upon substantial evidence and the proper legal criteria. *Scheck v. Barnhart*, 357 F.3d 697, 699 (7th Cir. 2004). Substantial evidence exists

when a "reasonable mind might accept [the evidence] as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). Even where "reasonable minds could differ" or an alternative position is also supported by substantial evidence, the ALJ's judgment must be affirmed if supported by substantial evidence. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008); *Scheck*, 357 F.3d at 699. Under the substantial evidence standard, the court neither reweighs the record nor second-guesses the ALJ's judgment. *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012). This "lax" standard is satisfied when the ALJ "minimally articulate[s] his or her justification for rejecting or accepting specific evidence of a disability." *Berger v. Astrue*, 516 F.3d 539, 545 (7th Cir. 2008) (internal signals omitted) (citing *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004)). Further, while reviewing a commissioner's decision, the Court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or substitute [its] own judgment for that of the Commissioner." *Young*, 362 F.3d at 1001.

**3. Discussion**

Plaintiff alleges the ALJ erred in in two respects in his December 28, 2021 decision: (1) he improperly explained his RFC conclusions and (2) he improperly evaluated Plaintiff's subjective symptoms. The Court disagrees with both of these contentions, as detailed below.

**3.1. The ALJ Properly Analyzed and Supported his RFC Assessment.**

The ALJ alone is responsible for determining a plaintiff's ability to work. See 20 C.F.R. § 404.1546(c). That ability to work is represented in the ALJ's RFC determination, which represents the most Plaintiff can do despite her limitations. *See* Social Security Ruling ("SSR") 96-8p. While medical source opinions are considered, the final responsibility for this determination is the ALJ's. *See Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014) ("[T]he determination of a claimant's [residual functional capacity or work abilities] is a matter for the ALJ alone – not a treating or examining doctor – to decide.").

4

The ALJ assesses a Plaintiff's RFC before Step Four of the sequential evaluation process. Here, when the ALJ assessed Plaintiff's mental abilities for work, the ALJ discussed medical records that showed normal mental status exams with normal memory and concentration. [R. 143-47.] The ALJ acknowledged that in 2015 and 2016 (several years before the alleged onset of disability) Plaintiff treated her mental symptoms with medications and group therapy. [R. 143.] Six months before the alleged onset date, in May 2019, Plaintiff underwent a psychiatric evaluation with nurse practitioner Lisa Siby. [R. 143, 716-21.] Plaintiff reported depressed mood and concentration problems; on exam, Ms. Siby observed a sad and flat affect, normal attention and concentrating ability, intact memory, and average intelligence. [R. 143, 719.] Ms. Siby prescribed medications for Plaintiff's symptoms. [R. 143, 721.] Plaintiff followed up with Ms. Siby in July 2019 and reported the same symptoms; her mental status exam showed she was clean and well-groomed, alert and oriented with normal attention and concentration, calm and cooperative behavior, intact memory, depressed mood, and flat affect. [R. 143, 909, 912.] Ms. Siby continued plaintiff's medication regimen. [*Id.*]

In October 2019, plaintiff saw nurse practitioner Donna Harris for a psychiatric follow up. [R. 144, 902.] Her mental status exam showed she was calm, cooperative, and engaged, her concentration and attention were normal, and her memory was intact. [R. 144, 905.] Ms. Harris prescribed a lower dose of Melatonin for sleep, continued Plaintiff on the same dosage of medication for her depression, and encouraged Plaintiff to add counseling and referred her to a therapist. [R. 144, 906.] The next month, Plaintiff met with a therapist for an assessment, at which time she denied any inattentiveness and difficulty concentrating. [R. 144, 900.] Plaintiff's mental status exam showed she was calm and engaged, had a sad and depressed mood, reported auditory and visual hallucinations, denied any suicidal and homicidal ideation, and had normal thought process and content. [R. 144, 901.] In November 2019, plaintiff underwent a consultative mental exam with John Hardie, Ph.D., as part of her application for benefits. [R. 144, 727-29.] Dr. Hardie observed Plaintiff was not oriented

5

to date, could not name three cities, had disorganized thoughts, appeared exhausted, recalled four words only after a five-minute delay, and could describe similarities and differences, but could not do serial sevens. [R. 144, 728-29.] Dr. Hardie diagnosed schizoaffective disorder and major depressive disorder. [R. 144, 729.]

Later in November 2019, Plaintiff went to the emergency room with complaints of back pain and anxiety. [R. 144, 784.] She had a normal exam and was noted to be well appearing; the emergency room physician did not note any mental deficits nor order a psychiatric evaluation. [R. 144, 792.] This is significant because the emergency room providers were people with whom Plaintiff did not have a relationship or regular interaction, and who did not have prior knowledge of her medical background; the emergency room staff were strangers to whom Plaintiff had to relay her medical history and adequately communicate her concerns in order to obtain their assistance. They are also providers specialized in quickly assessing patients, including for psychiatric issues. Despite the demands of the situation, the fact they noted no mental deficits nor ordered a psychiatric evaluation when one of Plaintiff's chief complaints was anxiety, reasonably suggested to the ALJ that Plaintiff's limitations were not as extreme as other records might have suggested (*e.g.*, Dr. Hardie's records, or records of Plaintiff's self-reports to her physicians).

At a follow-up with her therapist in December 2019, Plaintiff had a normal mental status exam. [R. 144, 897.] The next month, however, in January 2020, Plaintiff reported to her therapist she had been abducted and physically abused by her ex-boyfriend. [R. 144, 894.] The ALJ noted that, despite the traumatic nature of the assault and retelling the circumstances of the same, Plaintiff had a normal mental status exam. [*Id.*] Later that month, Plaintiff saw nurse practitioner Harris again and complained of difficulty sleeping. [R. 144, 890.] Ms. Harris noted a sad, depressed, and somber mood; sullen, sad, and tearful affect; impaired insight and judgment; normal thought process and content; no hallucinations; and intact memory and concentration. [R. 144, 890-91.] Ms. Harris prescribed

6

Zolpidem for sleeping. [R. 144, 891.] The next month, Plaintiff reported Zolpidem helped with her sleep. [R. 144-45, 886.]

In February 2020, Plaintiff told her therapist someone in a car outside her home was watching her, though police later confirmed that was not the case. [R. 145, 886.] Her therapist noted a normal mental status exam. [*Id.*] Plaintiff reiterated thoughts of someone watching her at her next therapy appointment; she feared leaving her house. [R. 145, 882.] Plaintiff had an anxious and irritable mood, but otherwise normal mental status exam. [R. 145, 883.] In April and May 2020, Plaintiff's therapist noted normal mental status exams in telehealth appointments. [R. 145, 866, 872.] Later in May 2020, Plaintiff reported less fatigue, fewer panic attacks, and less stress. [R. 145, 862.] Plaintiff told her therapist in July 2020 she was getting out of her house more and interacting with others. [R. 145, 1080.] Plaintiff's mental status exams in May and July 2020 were normal. [R. 145, 862, 1080.] In August 2020, Plaintiff told Ms. Harris her medications were working, and Plaintiff's therapist again noted a normal mental status exam. [R. 145, 1069, 1072.] In November 2020, Plaintiff reported some depression to her therapist, but she also reported flying to Las Vegas for a trip with her daughter and feeling good about a new car purchase. [R. 145, 1062.] Her mental status exam was unremarkable. [*Id.*]

Plaintiff continued to treat her mental symptoms in 2021. In February 2021, Plaintiff reported to her therapist she was feeling anxious and having difficulty sleeping. [R. 146, 1055.] However, Plaintiff admitted only sporadic compliance with her medication because she was concerned about grogginess when operating a motor vehicle. [R. 146, 1055-56.] Plaintiff's mental status exam showed pleasant affect; depressed mood; intact memory, concentration, judgment, and insight; and no abnormal thought content. [R. 146, 1055]. Plaintiff also saw Ms. Harris in February 2021, her first visit in six months. [R. 146, 1052.] Ms. Harris noted Plaintiff's symptoms were stable; Plaintiff denied perceptual disturbance and suicidal ideation, reported a good mood, and reported occasional trouble sleeping. [*Id.*] Her mental status exam showed intact immediate recall, intact remote memory, logical

7

thought process, and normal thought content. [*Id.*] Ms. Harris continued her medications. [*Id.*] Plaintiff showed up for a therapy visit in February 2021 angry after her pastor revealed something she said in confidence to another church member. [R. 146, 1048.] Other than her angry mood, her mental status exam was normal. [*Id.*] In April 2021, Plaintiff had another normal mental status exam by Ms. Harris. [R. 146, 1044.] In June 2021, Plaintiff began seeing advanced practice nurse Wanda Cegers, who observed fatigue, decreased speech volume, alertness, orientation, and intact memory on exam. [R. 146, 1035.] Ms. Cegers adjusted Plaintiff's prescribed medications. [*Id.*] In July 2021, Plaintiff told her therapist she was having difficulty sleeping; her mental status exam was normal. [R. 146, 1027.] At a visit in September 2021, Plaintiff told Ms. Cegers about mood issues due to family problems. [R. 146, 1024.] On exam, Ms. Cegers noted depressed mood, wandering attention, intact memory, and unremarkable thought content. [R. 147, 1024.] Ms. Cegers noted she could not determine the effectiveness of Plaintiff's medication due to plaintiff's adherence problems. [*Id.*] By October 2021, Plaintiff told her therapist that she was compliant with her medication, and it was working fine as she had no depression and no problems sleeping. [R. 147, 1020.] On exam, her therapist noted depressed mood, but the mental status exam results were otherwise normal. [*Id.*]

The ALJ also considered the prior administrative medical findings from January 2020 and March 2021. [R. 147-48]; 20 C.F.R. § 404.1520c. In January 2020, Joseph Mehr, Ph.D., reviewed Plaintiff's medical records and concluded she could perform one-to-two-step tasks learned in one-to-three months, and she could work in coordination with or proximity to others. [R. 70, 147.] At reconsideration, in March 2021, Howard Tin, Psy.D., concluded Plaintiff could understand and remember instructions for simple, routine, and repetitive tasks; concentrate and persist for two hours at a time in an eight-hour day with breaks; relate appropriately in undemanding social settings with only brief and superficial interactions; work in a low-stress environment; adapt to simple changes in routine; and perform one-to-two-step tasks. [R. 98, 147-48.]

8

Under the revised regulations pertaining to medical opinions, the "most important factors" an ALJ considers are a medical opinion's supportability and consistency with the record evidence. 20 C.F.R. § 404.1520c(a); *see also Albert v. Kijakazi*, 34 F.4th 611, 614 (7th Cir. 2022). The ALJ reasonably analyzed the prior administrative medical findings, particularly as it related to the consistency and supportability of these opinions. Specifically, the ALJ found the prior administrative medical findings somewhat persuasive, explaining that their assessment of moderate social limitations was consistent with Plaintiff's therapy notes showing she was pleasant and cooperative during appointments but had difficulty getting along with fellow church members and with her grandchild's grandmother. [R 148.] The ALJ further explained that the restriction to low stress, simple work was consistent with the treatment notes indicating Plaintiff could get overwhelmed if she had too many distractions. [*Id.*] However, the ALJ found nothing in the record to support a limitation to only one and two-step tasks, a decision which was well within his purview. [*Id.*] The ALJ did not substitute his judgment for that of the Agency experts. Rather, the ALJ was entitled to credit whatever portions of the prior administrative medical findings he found persuasive; he was not required to adopt every limitation therein. *See Jack A. v. Kijakazi*, 2021 WL 5882145, at *3 (N.D. Ill. Dec. 13, 2021) ("ALJ is not required to rely entirely on a particular physician's opinion or choose between the opinions [of] any of the claimant's physicians"). Although Plaintiff had impaired memory at the consultative exam with Dr. Hardie (which the ALJ discussed), the ALJ pointed to multiple other mental status exams at therapy and medication management appointments that showed intact recall and short-term memory. [*Id.*] The ALJ also noted the record showed Plaintiff was able to drive a car and prepare food in the microwave, both of which require multiple steps. [*Id.*]

Plaintiff separately faults the ALJ for making too much of her ability to drive a car. [Dkt. 17, p. 10.] While the record did contain Plaintiff's testimony she did not drive "that much" and had her daughter drive her [R. 31], the ALJ clearly felt this was outweighed by, among other things, Plaintiff's

9

reports to her physicians that she was not medication compliant because it interfered with her ability to drive [R. 146] and the fact that she purchased a new car in November 2020 [R. 145] despite her claims of only sporadic driving. Specifically, the ALJ found "the record show[ed Plaintiff] was more capable than alleged" in that it "suggests [Plaintiff] was able to *regularly* drive a car." [R. 148 (emphasis added).]

Ultimately, after analyzing the evidence of record to craft an RFC for the Plaintiff, the ALJ determined Plaintiff had a moderate limitation in the broad functional areas of interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing herself. [R. 138-39.] A moderate limitation meant the ALJ found Plaintiff's "functioning in this area independently, appropriately, effectively, and on a sustained basis is fair" or, generally speaking, average. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00(F)(2). The Court finds the ALJ adequately explained why he felt certain evidence was stronger than other evidence in leading him to his conclusion that Plaintiff had average limitations in these areas. The ALJ also adequately explained his reasoning for the other limitations he included within the RFC determination. Finally, while Plaintiff complains the ALJ failed to assess her abilities to engage in work activities on a sustained basis, per SSR 96-8p [Dkt. 17, p. 9], the Court does not find this to be true for the ALJ's opinion when read as a whole. The Court does not find reversible error here.

### 3.2. Plaintiff's Subjective Symptoms

The regulations set forth a two-step process for evaluating a plaintiff's statements about her impairments. *See* 20 C.F.R. § 416.929. An ALJ first determines whether a medically determinable impairment "could reasonably be expected to produce the pain or other symptoms alleged." 20 C.F.R. § 416.929(a). If so, the ALJ then "evaluate[s] the intensity and persistence" of the plaintiff's symptoms and determines how they limit the plaintiff's "capacity for work." 20 C.F.R. § 416.929. Next, the ALJ assesses whether medical evidence substantiates the plaintiff's symptoms. *See* SSR l6-3p. If medical

10

evidence does not confirm the intensity and persistence of the claimed symptoms, the ALJ considers a list of non-exhaustive factors. *See id.* However, an "individual's statement as to pain or other symptoms shall not alone be conclusive evidence of disability." 42 U.S.C. § 423(d)(5)(A); see also 20 C.F.R. § 404.1529(a) ("[S]tatements about your pain or other symptoms will not alone establish that you are disabled."). An ALJ is not required to credit a claimant's own reports of disabling symptoms. *See Simons v. Saul*, 817 F. App'x 227, 233 (7th Cir. 2020); *Ramona G. v. Saul*, 2019 WL 5420140, at *2 (N.D. Ill. Oct. 23, 2019) (citing 20 C.F.R. § 404.1529(a)). An ALJ's assessment of a plaintiff's subjective statements of symptoms need not be flawless and is entitled to deference unless it is "patently wrong," which is a "high burden." *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015); *Turner v. Astrue*, 390 F. App'x 581, 587 (7th Cir. 2010). Only when an ALJ's assessment lacks *any* explanation or support will a court declare it to be "patently wrong." *Elder*, 529 F.3d at 413-14.

Plaintiff argues remand is necessary based on the ALJ's consideration of her complaints of pain and the ALJ's finding that the medication Plaintiff took for her pain "long-term" was Ibuprofen. [Dkt. 17, pp. 14-15.] Regardless of whether the ALJ defined "long-term" (the Court does not believe it was necessary), Plaintiff's argument obscures the full picture. In reality, the ALJ considered far more than just Plaintiff's Ibuprofen use. The ALJ also considered the treatment Plaintiff received after her 2017 fall, where the ALJ noted Plaintiff was initially prescribed physical therapy, muscle relaxers, Lidocaine patches, and epidural steroid injections. [R. 141-43, 451, 454, 466.] The ALJ also acknowledged Plaintiff's complaints of 9/10 and 10/10 back pain. [R. 142-43.] However, the ALJ found this contrasted with the findings of consultative physical examiner Lisa Hosea, M.D., who saw Plaintiff in November 2019 and found only mild difficulty in Plaintiff's ability to get on and off the exam table, normal walking, no muscle spasm or atrophy, and some limitation in Plaintiff's range of motion in her back. [R. 142, 734-35.] The ALJ also noted that, in November 2019, although Plaintiff sought treatment at the emergency department for anxiety and 10/10 back pain, her physical exam

was normal, her blood pressure was not elevated, and she received a sedative and an injection of a nonsteroidal anti-inflammatory and was discharged with Ibuprofen. [R. 142, 784-85, 787.]

As to other treatment modalities for her back pain, the ALJ acknowledged that a lapse in Plaintiff's treatment in 2020 for her back impairment was understandable given the COVID-19 pandemic. [R. 142.] The ALJ noted that Plaintiff began physical therapy in July 2021, but her physical therapist discharged her about a month later, noting that Plaintiff had returned to hobbies like biking and walking, and she was "satisfied with her improvement." [R. 142-43, 1005, 1009.] The ALJ also noted that, although Plaintiff's mental health providers were not specialists in her physical symptoms, their notes did not indicate any signs Plaintiff was in any physical pain or discomfort. [R. 143.] The Court does not find this consideration by the ALJ misplaced. The ALJ's explanations concerning his evaluation of Plaintiff's physical symptoms are sufficiently supported; the Court does not believe the ALJ erred in his evaluation of Plaintiff's subjective complaints concerning her physical symptoms.

Plaintiff also faults the ALJ's consideration of her mental symptoms. [Dkt. 17, pp. 15-17.] Like when analyzing her physical symptoms, the ALJ similarly recognized reports that demonstrated mixed mental status exam results. The ALJ recognized evidence of anxious and depressed mood, difficulty sleeping, and fears of leaving the house. [R. 145-47 (referencing 882-83 1020, 1027, 1048, 1055).] The ALJ found this evidence contrasted the evidence of normal mental status exams, normal attention and concentration, and intact memory. [R. 143-47 (referencing 719, 862, 866, 883, 886, 894, 897, 901, 905, 912, 1020, 1027, 1044, 1048, 1052, 1069, 1072, 1080).] The ALJ also observed that Plaintiff reported improvement in her mental symptoms when she was compliant with her prescribed medications, which is an appropriate consideration. [R. 141; *see* 20 C.F.R. § 404.1529(c)(3)(iv) (ALJ may consider "type, dosage, effectiveness, and side effects of any medication [a claimant takes] or [has] taken to alleviate [her] pain or other symptoms"). In fact, the ALJ highlighted how Plaintiff "said she did not take [her medication] if she was going out because she was worried it would make her groggy while

12

driving." [R. 146.] This is not a case of the ALJ failing to recognize that sometimes mentally impaired individuals may have trouble adhering to a medication regimen. *See Kangail v. Barnhart*, 454 F.3d 627, 630-31 (7th Cir. 2006). Instead, the ALJ contrasted this purposeful non-adherence to a prescribed medication schedule with Plaintiff's statements she needed reminders to take her medications. [R. 138.] Upon review of the ALJ's decision, the Court does not find any suggestion the ALJ placed improper emphasis on Plaintiff's medication noncompliance as part of the subjective symptom evaluation.

The ALJ did not patently err in his evaluation of Plaintiff's subjective symptoms. Rather, the ALJ found "the objective medical evidence simply does not support [Plaintiff's] extreme allegations" and then he explained why. [R. 141.] The Court will not overturn the ALJ's decision on this basis.

4.  **Conclusion**

For the reasons detailed above, the Court finds the ALJ's decision to be supported by substantial evidence. Defendant's motion for summary judgment [Dkt. 20] is GRANTED; Plaintiff's motion for summary judgment [Dkt. 17] is DENIED. The final decision of the Commissioner denying benefits is affirmed.

**ENTERED:** August 18, 2023

Keri Holleb Hotaling,
United States Magistrate Judge